UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICHARD STEVEN JOHNSON, | No. 2: 16-cv-0745 GGH |
| Petitioner, | |
| v. | ORDER[1] |
| NEIL McDOWELL, Warden | |
| Respondent. | |

*Introduction and Summary*

Petitioner was convicted of performing a lewd act on a child under the age of 14 by force or violence combined with a kidnapping which facilitated the sex crime. The jury could not come to a verdict on forcible rape and other charges. He was sentenced to 25 years to life.

To a scientific certainty, petitioner committed some type of sex act with the victim on the day of the crime. This fact is not in dispute here, and does not depend upon the testimony of the victim. Rather, petitioner focuses his petition on the force or violence aspect and the kidnapping which was dependent on the victim's testimony. He asserts that the trial court's permitting the then seventeen year old victim/witness to testify turned away from himself and defense counsel,

---

[1] The case is before the undersigned as presider pursuant to 28 U.S.C. section 636(c).

1

and the trial court's permitting the victim/witness to write her answers on cross-examination, which were then read by the judge, violated his right of confrontation guaranteed by the Sixth Amendment.[2] Petitioner believes his right to confront the witness was violated per se and, in any event, the trial court did not make required factual findings at an evidentiary hearing to allow the victim/witness to testify as she did.

For the reasons given herein, the undersigned denies the petition.

I.   *Factual Background*

The factual background is helpful to put the confrontation issue in perspective:

   *The Crime*

   *The Prosecution's Case*

   In February 2009, 13–year–old A.S. lived at home with her mother S.S. and some of her siblings. Her sister J.S. lived in a separate apartment with her boyfriend—defendant—and their baby daughter.

   On February 28, 2009, defendant asked A.S. to go to the store with him and buy tampons for J.S. He did not want to buy tampons because he was a man. He drove A.S. to Foods Co., where she bought tampons for defendant.

   Rather than taking her home, defendant drove A.S. to a place she did not know. The place was about 15 minutes from the store and had a parking lot and buildings that looked like warehouses. A.S. felt she could not escape because there was no one else in the area. After parking, defendant got out of the car, opened the passenger door, and ordered A.S. into the trunk. A.S. got out of the car and defendant pushed her into the trunk.

   Defendant drove the car for a "pretty long" time. She did not know where she was when defendant stopped and opened the trunk. The place looked like a forest and she could not get away. Defendant then sexually assaulted A.S. in the back seat of the car. He told A.S. not to tell anyone and dropped her off near her home. A.S. went to a friend's house before going home.

   S.S. became worried when A.S. did not return home after several hours. A.S. said she was going with defendant; S.S. tried to call her after a few hours but got no answer. S.S. knew something was wrong when A.S. finally returned home, as her daughter's clothes were torn and her hair was messed up. S.S. asked what was

---

[2] Petitioner also couches his claims in terms of a Due Process Clause violation; however, the confrontation issue is governed by the specific terms of the Sixth Amendment.

2

wrong; A.S. said, "Mom, he lied to me." A.S. then told S.S. about the sexual assault, after which S.S. called the police.

A.S. was taken to the hospital for a medical examination. An officer who contacted her at the hospital found A.S. was crying and upset. She said defendant picked her up at around 10:55 a.m., took her to Foods Co., and then later struck her and forced her into the trunk of the car. Defendant had sex with her even though she told him not to. He dropped her off at an elementary school rather than her home.

J.S. testified she did not ask defendant to buy her tampons that day. He was supposed to pick up their daughter from S.S.'s home and return in time to take J.S. to work. J.S. called defendant when he did not return; defendant said he was fixing the car. She told an officer that defendant sounded "weird" and said he was out with A.S. when she talked to him on the phone that day.

A.S. told the examining nurse practitioner that defendant sexually assaulted her around noon that day. Defendant also backhanded her in the face and grabbed her by the arm during the assault. The nurse saw A.S. had a laceration and bruise on her elbow as well as dried blood in her nose. The gynecological exam found tearing of the hymen indicating a penetrating injury with a large object; the injuries were consistent with sexual assault.

A search of defendant's car revealed a Foods Co. receipt for the purchase of a box of tampons on February 28, 2009, at around 10:39 a.m. DNA taken from A.S.'s vagina and panties matched defendant's with probabilities of a random match ranging from one in 340 trillion to one in 130 quintillion. DNA from a swab taken from defendant's penis matched A.S.'s DNA with probabilities of a random match ranging from one in three million to one in 170 million. DNA swabs from a legal pad in the back seat of defendant's car, shorts found in the trunk, and from the trunk itself matched A.S.'s with probabilities of a random match ranging from one in 300 quadrillion to one in 9 quintillion.

A.S. gave a special assault forensic evaluation interview on March 2, 2009. A recording of the interview was played to the jury.

*The Defense*

A defense investigator interviewed A.S. on March 2, 2009. A.S. told the investigator defendant tried to kiss her. She denied being in the trunk of the car, and said sex may or may not have happened.

A nurse testifying as an expert in sexual assault examinations testified that an examination cannot determine whether the sex was consensual. She opined that the findings in this case could be consistent with consensual sex.

People v. Johnson, 2015 WL 365817 at * 1-2 (Cal. App. 2015).

3

II.  *AEDPA Standards*

As respondent points out, the key review standard is that supplied by AEDPA—whether the Supreme Court has announced a rule which can be applied to this case, and if so, could reasonable jurists could find as the Court of Appeal found: that no Confrontation Clause violation took place which would even necessitate findings by the trial judge, and whether in any event, the trial judge did make case specific findings.

The statutory limitations of federal courts' power to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA).  The text of § 2254(d) provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any   claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
> (1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

As a preliminary matter, the Supreme Court has recently held and reconfirmed "that § 2254(d) does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'"  Harrington v. Richter, 562 U.S. 86, 98 (2011).  Rather, "when a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication of state-law procedural principles to the contrary."  Id. at 99, *citing* Harris v. Reed, 489 U.S. 255, 265 (1989) (presumption of a merits determination when it is unclear whether a decision appearing to rest on federal grounds was decided on another basis).  "The presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely."  Id.

The Supreme Court has set forth the operative standard for federal habeas review of state court decisions under AEDPA as follows:  "For purposes of § 2254(d)(1), 'an unreasonable

4

application of federal law is different from an incorrect application of federal law.'" Harrington, supra, at 101, *citing* Williams v. Taylor, 529 U.S. 362, 410 (2000). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Id. at 101, *citing* Yarborough v. Alvarado, 541 U.S. 652, 664 (2004).

Accordingly, "a habeas court must determine what arguments or theories supported or . . could have supported[] the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." Id. at 102. "Evaluating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.'" Id. Emphasizing the stringency of this standard, which "stops short of imposing a complete bar of federal court relitigation of claims already rejected in state court proceedings[,]" the Supreme Court has cautioned that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." Id., *citing* Lockyer v. Andrade, 538 U.S. 63, 75 (2003).

The undersigned also finds that the same deference is paid to the factual determinations of state courts. Under § 2254(d)(2) factual findings of the state courts are presumed to be correct subject only to a review of the record which demonstrates that the factual finding(s) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." It makes no sense to interpret "unreasonable" in §2254(d)(2) in a manner different from that same word as it appears in § 2254(d)(1) – i.e., the factual error must be so apparent that "fairminded jurists" examining the same record could not abide by the state court factual determination. A petitioner must show clearly and convincingly that the factual determination is unreasonable. See Rice v. Collins, 546 U.S. 333, 338 (2006).

The habeas corpus petitioner bears the burden of demonstrating the objectively unreasonable nature of the state court decision in light of controlling Supreme Court authority. Woodford v. Viscotti, 537 U.S. 19 (2002). Specifically, the petitioner "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that

5

there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington, supra, at 102. "Clearly established" law is law that has been "squarely addressed" by the United States Supreme Court. Wright v. Van Patten, 552 U.S. 120, 125 (2008). Thus, extrapolations of settled law to unique situations will not qualify as clearly established. See e.g., Carey v. Musladin, 549 U.S. 70, 76 (2006) (established law not permitting state sponsored practices to inject bias into a criminal proceeding by compelling a defendant to wear prison clothing or by an unnecessary showing of uniformed guards does not qualify as clearly established law when spectators' conduct is the alleged cause of bias injection). The established Supreme Court authority reviewed must be a pronouncement on constitutional principles, or other controlling federal law, as opposed to a pronouncement of statutes or rules binding only on federal courts. Early v. Packer, 537 U.S. 3, 9 (2002).

The state courts need not have cited to federal authority, or even have indicated awareness of federal authority in arriving at their decisions. Id. at 8. Where the state courts have not addressed the constitutional issue in dispute in any reasoned opinion, the federal court will independently review the record in adjudication of that issue. Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).

Finally, if the state courts have not adjudicated the merits of the federal issue, no AEDPA deference is given; the issue is reviewed de novo under general principles of federal law. Stanley v. Cullen, 633 F.3d 852, 860 (9th Cir. 2012). However, when a state court decision on a petitioner's claims rejects some claims but does not expressly address a federal claim, a federal habeas court must presume, subject to rebuttal, that the federal claim was adjudicated on the merits. Johnson v. Williams, __U.S.__, 133 S.Ct. 1088, 1091 (2013).

III. *The Confrontation Clause Issue*

    A. Facts Regarding Confrontation or Lack Thereof

As is nearly always the case, The Court of Appeal has concisely, yet completely, set out the facts pertinent to the issues in this case:

6

*A.S.'s Testimony*

The direct examination of A.S. began with general questions about her and her family, which she answered without a problem. She then admitted not wanting to testify, and having said so to the prosecutor in an e-mail. After A.S. answered general questions about her sister J.S. and defendant, the prosecutor asked her about the events surrounding the sexual assault. A.S. answered some of the questions, but to others, she gave replies like, "I can't do this" or, "Can I leave?" She soon asked to take a break, and the trial court ordered a 15–minute recess.

During the recess, defense counsel moved for a mistrial based on a violation of defendant's right to due process. In support of the motion, counsel relied on A.S. being brought into the courtroom through a back door rather than the normal means of entry. Counsel noted that A.S., who was sitting next to a victim's advocate, cried during most of her testimony and continually stated that she did not want to testify. Admitting that these facts may not individually support a due process violation, counsel asserted that their cumulative effect deprived defendant of his right to a fair trial. The trial court disagreed and denied the motion.

When examination resumed, A.S. was able to answer questions about her sister's car and her desire to get a job, without any problem. As questioning moved to the events on the day of the sexual assault, she answered some questions, but others were answered with statements like, "I can't do this, I told you," or, "I don't remember." When the prosecutor asked A.S. whether she got in the trunk of defendant's car on the day of the incident, she replied, "I can't do this. I can't testify. Can I leave?" The prosecutor switched to asking A.S. about her reluctance to testify. She replied that it was because she was embarrassed and not because she was afraid of hurting her sister.

A.S. was initially able to answer the prosecutor's questions as the examination went into the events after the sexual assault. When the prosecutor again asked her about the events leading up to the sexual assault, A.S. increasingly answered with, "I don't remember" or, "I don't want to talk about it." The trial court called a break after she answered consecutive questions with, "Can I leave?" and, "I can't do this."

During the break, defense counsel said A.S. had replied she did not want to talk about it 12 to 14 times. Counsel renewed the due process objection, which the trial court denied.

Following the recess, the prosecutor asked to have A.S. give written answers during the examination. The trial court agreed. During the rest of A.S.'s direct and cross-examination, she gave her answers in writing, which were then read by the trial court.

The defense later renewed the objection. Defense counsel asserted A.S. effectively chose which questions she was going to answer before she wrote the answers down by stating she did not want to be there more than 14 times in reply to

7

questions. When A.S. wrote down her answers, her back was turned to counsel and the jury might not have been able to see her and assess her credibility. Counsel additionally asserted that the act of writing the answers to her cross-examination rather than facing counsel and answering prevented effective cross-examination.

The trial court found the defense had ample opportunity to cross-examine A.S., and she answered every one of the defense questions. The court stated that A.S. was "extremely emotional" before she was allowed to write down her answers. A.S. "was crying when she first entered," and was especially emotional "when she was asked questions specifically related to the alleged offense[s]." In deciding to allow A.S. to give written answers, the trial court relied on "the age of the witness now, the age of the witness when these offenses allegedly occurred, the nature of the charges, the violent nature of the charges, the sexual nature of the charges," and the court's observation of A.S.

The trial court additionally noted that it read the answers in a "speakable" but "emotionless" manner. A.S. did turn her back to defendant after the last break, and turned away from counsel when she wrote her answers. The trial court found this was part of A.S.'s demeanor that the jury could take into account. Denying defendant's motion, the trial court concluded by stating, "these slight deviations from regular practice were necessary to facilitate taking of the evidence and to facilitate the search for the truth, which this process is all about."

People v. Johnson, at * 2-3.

B. The Court of Appeal Ruling

In treating each issue separately, i.e., the turning of the back issue separately from the writing of the answers and the reading of those answers by the trial judge, the Court of Appeal discussed the two primary Supreme Court cases ruling on situations where the confrontation allowed at trial was less than that usually had. In Coy v. Iowa, 487 U.S. 1012 (1988), the Court found that placing a screen between the defendant and the complaining witnesses violated the defendant's confrontation rights. Stressing the importance of confrontation as the norm, the Court found that a defendant was "guaranteed" a face-to-face meeting in court with the complaining witnesses. Id. At 1020. As the Court of Appeal stressed however, the Confrontation Clause did not require the witness to look at the defendant and/or defense counsel; the witness was free to look away, or at the ground, or elsewhere. Id. at 1021.

In Maryland v. Craig, 497 U.S. 836, 857 (1990), the Court permitted a child to testify via a one-way closed circuit television (the defendant could see the child, but not vice versa). The

general rule to be applied was:

> "The requisite finding of necessity to depart from face-to-face confrontation must be case specific; the court must hear evidence and determine the procedure is necessary to protect the welfare of the particular child witness. (Id. at p. 855 [111 L.Ed.2d at p. 685].) The court must find the child witness would be traumatized by the presence of defendant and that such emotional distress is more than de minimis. (Maryland at p. 856 [111 L.Ed.2d at p. 685] (1990)].)

People v. Johnson at *4.

      The Court of Appeal looked to similar examples of confrontation issues in California case law to assist in determining whether the trial judge had erroneously applied the general rules set forth in Coy and Craig. In People v. Sharp, 29 Cal. App 4th 1772 (1994), disapproved on other grounds, People v. Martinez, 11 Cal. 4th 434, 452 (1995), a prosecutor was permitted to be so situated that the defendant's view of the witness was somewhat obstructed (limited to a side and back of the witness" head. People v. Gonzalez, 54 Cal. 4th 1234 (2012), involved a situation where a the testifying witness, an eight year old boy who had presumably observed the murder of a sibling, was permitted at preliminary hearing to sit at an angle to the defendant in view of the questioning counsel; the testimony was videotaped and permitted to be played at the trial. The Court of Appeal herein likened its situation to simply one akin to the situation where the victim/witness purposefully refused to look at the petitioner. People v. Johnson at *5. The Court of Appeal then turned to the issue of having the victim/witness write her answers in lieu of verbally responding, and then having the trial judge read those answers in a "speakable" yet "emotionless" manner. This procedure was likened (citing state cases) to situations where a witness was compelled to utilize an interpreter either because of a disability or the inability to understand and speak English. The judge was acting, more or less, just like another type of interpreter. Id.

      C. Application to This Case

      Thus, for AEDPA purposes, the Supreme Court has fashioned a general rule to be applied in each individual case depending on the circumstances of that case. It is to be stressed that in applying the general rule, the undersigned is not looking for the "best" or "most correct" answer

9

1    to the victim/witness predicament that faced the trial court.  Rather the undersigned emphasizes
2    again, that the only issue here is whether the Court of Appeal (and hence the state supreme court)
3    decided the issues in such a way that reasonable jurists could not agree with those
4    findings/holdings.  And, as set forth in the AEDPA standards, application of a general rule to case
5    specific situations requires that greater leeway be given to the state courts.

6        In assessing the AEDPA reasonableness, the undersigned initially has difficulty with the
7    treating of each confrontation issue separately, i.e., the back turning, *and then* the writing of
8    answers verbally read by the trial judge, instead of reviewing the entire range of issues as they
9    would have collectively impacted the confrontation issue.  This is so because the impact of the
10   procedures was a collective impact on the jury and the petitioner—not one with singular and
11   separate impact.[3]  The jury was forced to interpret the witness's demeanor not only with an
12   obstructed view of the witness, but also without hearing the witness's voice with all its different
13   credibility indicia, e.g., hesitating voice, emotion laden answers, evasiveness, inability to
14   formulate efficient answers to questions which should have been quickly answered, and the like.
15   Rather, the procedure here was slow, even ponderous, with each question awaiting a writing of
16   the answer from a view obstructed witness, and then the reading of the answer by the judge with
17   the logical inference that the jury would be focusing on the judge as the answers were verbally
18   given.  The minimization of the collective issue by its division was not a reasonable way to assess
19   the confrontation problem.

20       Moreover, it is not reasonable to conclude that the confrontation circumstances here were
21   merely a "slight deviation" from the norm in most cases.

22       This does not end the issue, however, because an assessment must be made of the ultimate
23   AEDPA reasonableness even viewing the issues collectively.  Upon review of all the

---

[3] The undersigned agrees with the Court of Appeal that if viewed singularly, the turning of one's back to the defendant and/or counsel is probably not a violation of the Confrontation Clause.  See Bailey v. Woodford, 2010 WL 4702348 (C. D. Cal. 2010) (back was turned to defense counsel and defendant); Spencer v. Yates, 2011 WL 2118862 (E.D. Cal. 2011) (left side of face was shielded from view of defendant).  The more problematic issue, when viewed singularly was the witness' writing of answers to the questions and then having those answers read by the *judge* instead of an anonymous court functionary.

circumstances, the undersigned cannot find the Court of Appeal decision AEDPA unreasonable.

First, the parties have not cited, and the undersigned is not aware of, on point Supreme Court cases dealing with the *collective* circumstances.[4] Therefore, the conclusion of the Court of Appeal holding that no Confrontation Clause violation took place is given even greater leeway in an already very deferential AEDPA setting.

Moreover, the jury had seen for some time the verbal answers of the defendant-- emotional and evasive as they were.  These responses and the manner in which they were made, may well have stuck in the jury's mind when the judge was reading the answers, some of which, according to defense counsel were also similarly very evasive.  If the *entire* testimony had been written and read, the outcome here might well be different.

Also, previous statements that the victim/witness made, when the criminal event was fresh in the victim's mind—and not necessarily the statements made four years afterwards by a then reluctant child, witness, were most probably the more important evidence before the jury.

Importantly, the trial judge did make reasonable findings concerning the procedures he utilized, and his certain observation of the witness turning her back, given the circumstances. Although problematic, the procedures were thought out, and the trial judge was faced with a difficult situation.

Finally, for all of the asserted confrontation errors, at least the witness was in court, visible to the jury, and not in the sterilized atmosphere of a sound and view proof room (from the witness' standpoint) which would have been the case had one-way closed circuit television been utilized as a means to calm the witness.

The undersigned has reviewed petitioner's cited case of People v. Murphy, 107 Cal. App. 4th 1150 (2003).  Of course, this case does not bind the undersigned in this AEDPA context, nor is it binding precedent even if this state case correctly analyzed the Supreme Court precedents, and the appellate court in this case was in error.  Nevertheless, it is useful for purposes of

---

[4] The undersigned has not found lower court cases with very similar factual collective circumstances.

persuasive analysis. In this case, a very distraught *adult* witness was found by the trial court to be hyperventilating and sobbing and making noises which made hearing her testimony very difficult. The prosecution told the judge (no evidence was taken) that the witness was disturbed at seeing the defendant. The trial court determined that the interests of justice were the main concern, and such warranted the placing of a plexi-glass screen, a type of one-way glass which enabled the defendant to view the witness, but not vice-versa.

The Murphy appellate court found fault with the trial judge's actions after review of the Supreme Court precedents discussed above. The major problems found were associated with the fact that this was an adult, not a child witness, and that the trial court had not taken evidence to ferret out the cause of the undoubted problems that the witness was having. The Murphy case is distinguishable from the case at bar for those issues. However, like the case here, the appellate court did not believe that the screen was simply a slight deviation from normal confrontation in court. Like the case here, it was evident in Murphy that the entirety of the witness testimony had not taken place behind the plexi-glass.

This case gives the undersigned some doubt about his conclusions, even in the AEDPA context. Moreover, the victim witness here claimed to be "embarrassed" by the events perpetrated against her—not "traumatized" by petitioner's presence at trial. It is perhaps an open question whether embarrassment could be equated with traumatization. Nevertheless, the undersigned has not been cited cases which find that such is not the case; in any event it is not AEDPA unreasonable to so find. Even the Maryland v. Craig court found traumatization and embarrassment to be the same, at least in portions of the opinion. "The critical inquiry in this case, therefore, is whether the use of the procedure is necessary to an important State interest… We have of course recognized that a State's interests in 'the protection of minor victims of sex crimes from further *trauma* and *embarrassment*'is a 'compelling'one." Maryland v. Craig, 497 U.S. at 852 (emphasis added). Moreover, in analogous circumstances, "embarrassment" has been a sufficient factor to modify confrontation rights. See Graham v. Addison, 304 Fed. Appx. 670 *2 (10th Cir. 2008); LaChappelle v. Moran, 699 F.2d 560, 564-565 (1st Cir. 1983).

12

As noted above, Murphy involved an adult witness. Although the "child" in this case was 17 years old, the trial judge thought she was still a child in need of some assistance in testifying. Moreover, testimony concerning embarrassment by the victim/witness in the case at bar was elicited by the prosecution; the facts were not simply told to the judge by the prosecutor. And, there is no requirement that the judge actually does the questioning, nor is there a requirement for a formal evidentiary hearing. Further, the victim/witness' conduct was evidence itself observable to the judge. Repeating the facts at evidentiary hearing of what was clearly evident at trial would serve no purpose.

At the risk of unnecessary repetition, the point here is not whether petitioner's appellate court was incorrect, but whether it was so *unreasonably* incorrect that an AEDPA remedial violation took place. The undersigned ultimately cannot go that far.

Even if the undersigned is giving too much AEDPA deference herein to the state courts on the violation issue, and even if there were a Confrontation Clause violation, the undersigned must still assess whether the error had a substantial and injurious effect on the verdict. Merolillo v. Yates, 663 F.3d 444, 454 (9th Cir. 2011), holding that the Brecht v. Abrahamson, [5] analysis must be applied to an alleged Confrontation Clause violation. Much of the undersigned's reasoning set forth above would also apply to this analysis. And, importantly, there was not a scintilla of doubt that petitioner had sex with a thirteen year old girl—a serious crime in its own right. This is not a case where the sex act itself was in question, just the means by which it was carried out. In this regard, the jury was certainly entitled to believe the victim witness' damning statements made right after the events in question, e.g., that the victim was forced into the trunk of the car and so forth, as opposed to the after-the-fact emotional, pressured or contrived, but contradictory, statements/actions of the victim/witness given to defense investigators and others months or years after the criminal event. The fact that the victim/witness in this case was equivocal with the defense investigator even about the occurrence of a sex act *per se*, in light of the scientific

---

[5] 507 U.S. 619 (1993).

certainty that some type of sex act took place, must have spoken volumes to the jury about which version was correct.[6]

*Conclusion*

AEDPA matters. The petition shall be denied. However, the undersigned determines that a Certificate of Appealability is appropriate in this case.

The Clerk shall enter judgment for respondent.

DATED: March 28, 2017

/s/ Gregory G. Hollows
GREGORY G. HOLLOWS
UNITED STATES MAGISTRATE JUDGE

---

[6] Petitioner does not contend that the evidence elicited at trial in its entirety was insufficient for conviction on the forcible lewd act count.